IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES L. OLIVAREZ
    Plaintiff,

OPINION & ORDER

v.

12-cv-884-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff James L. Olivarez seeks judicial review of a final determination by the Commissioner that Olivarez was not disabled within the meaning of the Social Security Act. Olivarez contends that remand is warranted because the administrative law judge erred in formulation of the residual functional capacity determination ("RFC"). For the reasons set forth below, the case will be remanded for further consideration.

## FACTS

### I.    Background

On June 25, 2010, an ALJ issued a decision denying Olivarez's application for Disability Insurance Benefits ("DIB"). (AR 25.)[1] In the application, Olivarez alleged disability beginning October 30, 2009. (AR 25.) His application was also denied upon reconsideration. (*Id*.) On January 10, 2011, Olivarez filed a written request for a hearing, and on February 14, 2010, ALJ John H. Pleuss held a hearing. (*Id*.) On March 30, 2012, the ALJ issued a decision finding that Olivarez was not disabled within the

---

[1] The citations in the Order are drawn from the Administrative Record ("AR"). (Dkt. # 7)

meaning of the Social Security Act from October 30, 2009, through the date of the decision. (AR 37.) That became the final decision of the Commissioner when the Appeals Council denied Olivarez's request for review. (AR 1-6.) On March 11, 2013, Olivarez filed a timely complaint for judicial review in this court pursuant to 42 U.S.C. § 405(g).

## II. Medical History

Since at least 1994, Olivarez has dealt with a multitude of psychological issues including Bi-Polar Disorder, severe depression, and recurring suicidal tendencies. In 1994, Olivarez was hospitalized for suicidal ideation. (AR39-40.) His suicidal tendencies would resurface five years later when it was reported that Olivarez had attempted to hang himself but the rope broke. (AR 838.) Olivarez was again admitted to a mental health facility for suicidal threats on August 17, 2004, with a GAF score of 45.[2] (AR 798, 810.) During his admission to the same hospital, Norwood Mental Health, in February 2005, Olivarez was noted as having both manic and anxiety episodes and a GAF score of 35. (AR785, 786.)

In May 2007, Olivarez was once again admitted to the hospital because of another suicidal episode dealing with hanging himself. (AR 763-72.) On May 4, 2009, a depression screening found Olivarez had thoughts of suicide or harming himself half of

---

[2] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function on a scale of 1-100. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 45 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). *See Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed., American Psychiatric Association 2000).

the days in a two week period. (AR 501.) On July 6, 2009, it was noted that "[Olivarez] continues to struggle maintaining emotional equilibrium and was detained involuntarily at Norwood Mental Health due to sudden changes in mood." (AR 367.) On October 12, 2010, Olivarez stated, "I hear voices, last week about 2-3 times a day, always telling me to hurt myself. In the past the voices have told me to hurt others, they are not telling me to hurt others now." "I have suicidal thoughts most of my life. I hear this voice in my head to do it." (AR470.)

### III. Relevant Medical Evidence

During 2010 and 2011, Dr. Michael Oberg at the Marshfield Clinic oversaw Olivarez's medication. (AR 60-61.) As his treating psychiatrist, Olivarez visited Dr. Oberg monthly for treatment and medication monitoring. (AR 61.) In support of Olivarez's disability claim, Dr. Oberg restricted his exertional abilities to less than sedentary work. He further opined that Olivarez is "unable to work at this time." (AR 691.) Finally, Dr. Oberg noted that "Based on the history I have, [Olivarez] has been repeatedly unable to sustain employment and this would seem to support his request for disability." (*Id*.)

In addition, state agency psychologists who examined Olivarez's records found moderate limitations in social functioning and concentration, persistence or pace ("CPP"). (AR 605.)[3] In considering the Mental RFC, these psychologists found that the claimant had the following moderate limitations:

---

[3] The two State Agency psychologists included Drs. Lefere and Spear. The ALJ purported to give both these opinions "significant weight." (AR 31.)

(a) The ability to understand, remember and carry out detailed instructions;

(b) Maintain attention for extended periods;

(c) Perform activities within a schedule, maintain regular attendance and be punctual within customary, usually strict tolerances;

(d) Work in coordination with or proximity to others without being unduly distracted;

(e) Complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;

(f) Accept instructions and respond appropriately to criticism from supervisors; and

(g) Respond appropriately to changes in a routine work setting.

(AR 590-592.)

## IV. ALJ Decision

The ALJ found that Olivarez had not engaged in substantial gainful activity since October 30, 2009, the alleged onset date. (AR 27.) The ALJ also found the following "severe" impairments: bipolar disorder, depression, diabetes mellitus, and substance abuse disorder. (AR 27.) Even so, the ALJ found that Olivarez did not have an impairment or combination of impairments that meets or medically equals an impairment set forth in the Listing of Impairments. (AR 27.)

With respect to CPP, the ALJ stated:

> The claimant states in his Function Report dated May 26, 2010, that he can pay attention for about 5 minutes, but he has problems not listening, forgetting things, losing concentration, and not completing tasks. He states that he does poorly with both written and spoken directions and he does not handle stress or changes in routine well. State agency psychologist Esther Lefevre, Ph.D. and Jack Spear, Ph.D. reviewed the claimant's record and determined that he has moderate limitations in this category.
>
> As for episodes of decompensation, Olivarez had experienced one to two episodes of decompensation, each of extended duration.

(AR 28-29.)  The ALJ ultimately determined that Olivarez has the Residual Functional Capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: "the claimant is limited to only occasional interactions with co-workers, supervisors, and the general public.  The claimant is limited to a job performing no more than occasional decision-making, with few, if any workplace changes, and involving simple, repetitive tasks and no fast-paced production line work.  The claimant will likely *be off-task for about 5%* of the work day in addition to regularly scheduled breaks, and will be absent from work about 1 day per month."[4][5]  (AR 31 (emphasis added).)

---

[4] In support for these findings, the ALJ broadly stated:

> The basis of these limitations is the opinions of state agency psychologist Esther Lefevre, Ph.D. set forth in her Supplemental Mental Residual Functional Capacity Assessment dated December 28, 2010. Dr. Lefevre reviewed the claimant's record and found that he had moderate limitations with regard to: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance and being punctual within customary tolerances; completing a normal workday and workweek

5

Next, the ALJ determined that Olivarez is capable of performing past relevant work as a farm worker, diversified crops II, unskilled, at the medium exertional level; construction worker I, semi-skilled, at the heavy exertional level; and roofer, semi-skilled, at the heavy exertional level as actually performed, as a skilled position, at the medium exertional level as generally performed. (AR 35-36.) In the alternative, the ALJ also concluded that based on the testimony of the vocational expert and considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant could perform. (AR 37.)

---

> without interruptions from psychologically-based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. Dr. Lefevre also found that the claimant was moderately limited as to his ability to work in coordination with or proximity to others without being distracted by them, as to the ability to accept instructions and respond appropriately to criticism from supervisors, as to the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and as to the ability to respond appropriately to changes in the work setting.

(AR 30-32.)

[5] The RFC was also supported by Dr. Spear -- another state psychologist. The ALJ summarized his findings as follows:

> The above residual functional capacity assessment is also supported by the opinions of a second state agency psychologist Jack Spear, Ph.D. [who] reviewed the claimant's record and found that he had moderate limitations as to his ability to understand, remember and carry out detailed instructions, and as to the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Spear also found that the claimant was moderately limited as to the ability to work in coordination with or proximity to others without being distracted by them, as to the ability to accept instructions and respond appropriately to criticism from supervisors, as to the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and as to the ability to respond appropriately to changes in the work setting. Dr. Spear noted that although the claimant had been detained on April 6, 2009 . . . after an overdose attempt to kill himself and had 14 hospitalizations since 2002 for suicidal ideation or for alcohol abuse, his daily symptoms do not appear to be debilitating.

(AR 33-33.)

Accordingly, the ALJ found that Olivarez was not under a disability as defined in the Social Security Act. (AR 37.)

## OPINION

### I. Standard of Review

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must also explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.; see Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). When the administrative law judge denies benefits, he or she must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Olivarez principally contends that the ALJ erred in assessing his RFC determination with respect to limitations in CPP. Because the RFC was deficient, Olivarez contends that questions to the vocational expert were similarly deficient. (AR 33.) *See Steele* 290 F.3d at 942 (hypothetical questions posed to the VE "ordinarily must include all limitations supported by medical evidence in the record").

In *O'Connor–Spinner v. Astrue,* the state examiner and the ALJ concluded that the claimant had moderate limitations in CPP because of her depression, but the ALJ asked the VE to consider only a "hypothetical worker [who] was restricted to routine, repetitive tasks with simple instructions." 627 F.3d 614, 617 (7th Cir. 2010). On appeal, the Seventh Circuit rejected the Commissioner's argument that the limitation to routine and repetitive tasks "implicitly incorporated" limitations for concentration, persistence and pace because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.* at 620. The *O'Connor–Spinner* court held that limiting the hypothetical worker to routine repetitive tasks did not adequately "orient the VE to the totality of a claimant's limitations." *Id.* While some exceptions exist to this general rule,[6] the Seventh Circuit stated that the ALJ should refer "expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure

---

[6] The exceptions include: "(1) where the record revealed that the VE had reviewed the claimant's medical records or heard testimony about the limitations; (2) where the ALJ used alternative phrasing and "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform; or (3) where the ALJ's hypothetical question specifically mentioned the underlying condition that caused the difficulties with concentration, persistence, and pace." *O'Connor–Spinner*, 627 F.3d at 619–20.

8

reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

Unlike *O'Connor–Spinner*, this case is not one where the ALJ failed to properly characterize each of the claimant's moderate limitations. Rather, the case is one where the ALJ failed to *explain* why he arrived at the limitation(s) he did.[7] In particular, there is no reference in the record as to the basis for assigning to Olivarez a risk of being off-task 5% of the day.

As in all cases, an ALJ must assess a claimant's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). Examples of the types of evidence are the claimant's medical history, medical signs and laboratory findings, and medical source statements. SSR 96–8p.

> The RFC assessment *must include a narrative discussion describing how the evidence supports each conclusion*, citing specific medical facts . . . and nonmedical evidence . . . . [T]he adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also *explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved*.

SSR 96–8p (emphasis added).

As an initial matter, the evidence supporting the ALJ's conclusion regarding a claimant's CPP is critical. It forms the core of their mental limitations (*i.e.,* non-exertional

---

[7] There is also an issue, addressed later, as to whether each of the limitations have been accommodated for in the RFC in light of the Seventh Circuit's relatively recent pronouncements in *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014).

limitations). *See Rapp v. Colvin*, No. 12-CV-353-WMC, 2015 WL 1268327, at *6 (W.D. Wis. Mar. 19, 2015).[8]

Olivarez points out that the ALJ "never mentioned" how he arrived at the finding that he would be off-task 5% of the day. (Dkt. #18 at 10.) Specifically, Olivarez argues that the ALJ failed to "explain how he determined he would be off-task for 5% of the day, as opposed to 10%, 15% or 20%." (*Id.*) Because the ALJ fails to provide any explanation on this issue, Olivarez argues remand is required. The court agrees, particularly in circumstances where the vocational expert, when cross-examined by counsel, opined that there would be no jobs for Olivarez had he been off-task for 10-15% of the time. (AR 91-92.)

To counter, the Commissioner rejects the notion that the ALJ was required to articulate a specific reason for the 5% off-task limitation. The Commissioner seeks to drive home this point by noting that Olivarez's failure to identify any problem with the ALJ's other findings that he was limited to: (1) simple, repetitive tasks; (2) tasks that did not require more than occasional decision making; and (3) tasks that involved few, if any, workplace changes, even though the ALJ did not identify separate specific reasons for those limitations.

---

[8] Ideally, the Commissioner would issue a Social Security Ruling that provides further guidance on the issue of CPP. More specifically, the ruling would address the evidence or factors an ALJ can rely upon in formulating the quantitative and qualitative limitations where severe, moderate or low CPP is concerned and what, if any, "shortcuts" are appropriate -- whether by kind of work, percentage of impact on a claimant's workday or other formulaic benchmarks -- in translating those limitations into a workable RFC.

*First*, each of the findings ((1)-(3)) above correlate with *some* (but not all) of the medical limitations ((a)-(g)) identified by the State Psychologists and afforded "significant weight" by the ALJ. (AR 31.) Specifically, Drs. Lefevre and Spear opined that Olivarez was moderately limited in his ability to: (a) understand, remember and carry out detailed instructions; (b) maintain attention for extended periods; (c) perform activities within a schedule, maintain regular attendance and be punctual within customary, usually strict tolerances; (d) work in coordination with or proximity to others without being unduly distracted; (e) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (f) accept instructions and respond appropriately to criticism from supervisors; and (g) respond appropriately to changes in a routine work setting. (AR 590-592.)

Since these are qualitative limitations, they beg the question as to *how* the ALJ arrived at the figure of 5% off-task reduction. Certainly, there is nothing in the evidence to support this quantitative conclusion. Nor does the ALJ attempt to explain how the doctors' qualitative limitations lead to a seemingly arbitrary percentage. Moreover, the ALJ can cite no regulation, law or Social Security Ruling that would support the adoption of a percentage reduction without support in the record.

Thus, the ALJ's failure to comply with SSR 96–8p constitutes error. Indeed, given the ALJ's silence and the minimal record, it cannot be said that Olivarez was any more or less likely to be off-task 5% of the day than being off-task for 50% of the day. Without more, the 5% figure does not even point in favor of Olivarez's having moderate

11

limitations in CPP. Rather, the vocational expert could well have understood the evidence to mean that Olivarez was capable of working 95% of the time *without* the qualitative limitations otherwise credited in the medical record. While this view is speculative, it presents the precise problem that SSR 96–8p seeks to guard against by requiring the ALJ to include "a narrative discussion describing how the evidence supports each conclusion."[9] Because of this failure to provide a rationale to support the conclusion drawn in the RFC, the ALJ's decision is not based upon substantial evidence and remand is required. *See* SSR 96–8p.

*Second*, and as a corollary for the first, an ALJ must explain his analysis of the evidence with enough detail to permit meaningful appellate review. *See Herron,* 19 F.3d at 333-34; *see also Tapia v. Astrue*, 2012 WL 3100380 *8 (E.D. Wis. July 30, 2012) (case remanded when "the ALJ took no effort to explain why plaintiff would be off task 5% of the time"). Because the ALJ has failed in this respect, this provides further grounds for remand since the court cannot meaningfully assess whether substantial evidence supports the 5% limitation since there is no discussion of the evidence to support same. *See Ehrhart*, 969 F.2d at 538 (explaining that a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence).

One further point is worth noting: given that remand is warranted for the reasons stated above, the ALJ should assess whether each of the medical limitations in (a)-(g)

---

[9] By providing a narrative, it also prevents the ALJ from playing doctor and supplying conclusions in the RFC without substantial evidence. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

should be included in the RFC determination itself.  This is because recently, the Seventh Circuit has gone to great pains in holding that each of a claimant's specific deficiencies in CPP should be articulated in an RFC determination.  In *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), for example, the Seventh Circuit detailed moderate limitations in CPP, identified by the claimant's doctor, in his "(a) ability to carry out detailed instructions, (b) perform within a schedule, (c) be punctual, (d) perform at a consistent pace, and (e) to complete a normal workday and workweek."  *Id.* at 857.  Given these limitations, the Seventh Circuit was "hard-pressed to conclude" that the ALJ's RFC finding was adequate in describing him as an individual who "could perform unskilled tasks, related superficially to small numbers of people, and attend to tasks long enough to complete them."  *Id.* at 857-58.[10]  The Seventh Circuit remanded for further proceedings, concluding that the ALJ failed to "build an 'accurate and logical bridge' between the evidence of mental impairments and the hypothetical and the mental RFC." *Id.* at 859. [11]

      Notably, there are more even moderate limitations in this case than in *Yurt*, which only reinforces the need for the vocational expert to be informed of these limitations, either through a re-formulated RFC determination or inspection of the medical record.

---

[10] Finding that the RFC and questions to the vocational expert were deficient, the court also stated that "the hypothetical [question] does nothing to ensure that the VE eliminated from her responses those positions that would prove too difficult for someone with [the claimant's] depression and psychotic disorder." *See Yurt*, 758 F.3d at 857-58.

[11] There is also the issue of whether evidence from the treating physician has been properly assessed.  This question is a close call. But given that the ALJ will need to re-consider the RFC, the ALJ would be well served to review the relevant factors that apportion weight to a treating physician. 20 C.F.R. § 404.1527(d)(2). Upon review of Dr. Oberg's evidence, and in light of a re-formulated RFC, the ALJ may find that Dr. Oberg's evidence better aligns with the record as a whole and apportion greater weight to his medical opinion.

Accordingly, on remand, the ALJ should not only explain the basis for the 5% limitation, but why *each* of the limitations ((a)-(g)) are not *expressly* reflected in the RFC determination.

## ORDER

IT IS ORDERED that the decision of defendant Carolyn Colvin, Acting Commissioner of Social Security, denying plaintiff James Olivarez's application for disability benefits is REVERSED and the case is REMANDED to the commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 1st day of April, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge